# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

JERRY JOHN SWANTEK,

       Defendant-Appellant.

UNPUBLISHED
November 30, 2017

No. 334451
Ingham Circuit Court
LC No. 15-000419-FC

Before: M. J. KELLY, P.J., and RONAYNE KRAUSE and BOONSTRA, JJ.

PER CURIAM.

Defendant, Jerry Swantek, was charged with assault with intent to murder, MCL 750.83, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. At trial, he argued that he had acted in self-defense and presented evidence supporting his claim; however, the trial court refused to instruct the jury on self-defense. Following the deliberations, the jury acquitted Swantek of the assault with intent to murder charge, as well as a lesser included charge of assault with intent to do great bodily harm less than murder, MCL 750.84, but convicted him of felonious assault, MCL 750.82, and felony-firearm. Because the trial court abused its discretion by refusing to instruct the jury on self-defense, we reverse and remand for a new trial.

## I. BASIC FACTS

This case arises out of an altercation between two drivers: Swantek and Steven Cobb. It is undisputed that both were driving in the area of Stockbridge, Michigan around 9:40 p.m. on April 17, 2015. Cobb testified that he observed Swantek run a stop sign at a four-way intersection. Because he had to travel the same direction to get home, Cobb followed Swantek's vehicle. He testified that Swantek was "going back and forth quite a bit" and was traveling about 10 or 15 miles below the posted speed limit. When Swantek turned onto M-52, Cobb again followed him because he lived on M-52 and was heading home. Cobb testified that as he turned onto M-52, Swantek "spiked" his brakes three times. A little later, the vehicle pulled into a gas station. Cobb also pulled into the station because he wanted to get something to drink. Cobb asserted that when Swantek pulled into the gas station, he stopped abruptly. As a result, Cobb had to back up and drive around Swantek's truck to proceed. Cobb testified that while he was pulling around the truck, Swantek cursed at him, and he responded "whatever dude," as he drove past him.

-1-

Cobb asserted that because he did not want to get into a fight he decided to leave the gas station without getting out of his vehicle. He stated that he turned onto southbound M-52 and Swantek followed him, which made him believe Swantek was coming after him. Cobb, therefore, pulled off the road by a deserted building and shut off his lights so Swantek could not follow him. Then, when Swantek drove by, he pulled out behind him so that he could get Swantek's license plate so he could call in Swantek as a suspected drunk driver.

After about a half a mile, Swantek slammed on his brakes and pulled over. Cobb testified that he pulled over as well and shined his headlights on Swantek's license plate. He called 911 and, while he was on the phone with the 911 operator, Swantek hit the gas and made a U-turn. Cobb claimed that he started to continue southbound on M-52, but after Swantek passed him he heard six gunshots. Cobb stated that he then made a U-turn so he could follow Swantek and get a direction of travel for the 911 operator. He testified that he stayed a long distance behind Swantek, however. After a while he gave up pursuit and returned to the gas station to meet with a police officer.

At the gas station, the police officer noted that there were three bullet holes in Cobb's vehicle. It is undisputed that one bullet struck the tailgate, one struck below the bumper, and the third struck on the left side of the gas cap. The prosecution introduced testimony that at least two of the bullets entered the vehicle at a forward angle, i.e. from the rear of the vehicle heading toward the front of the vehicle.

Swantek testified to the same order of events, but his explanation varied from Cobb's at times. He testified that he was returning from an AA meeting with his friend, Adam King. While he was driving Cobb came "speeding up" behind him, started tailgating him, and offset his vehicle so that his headlights were shining in Swantek's side-view mirror. Swantek denied driving erratically and asserted that he was trying to drive under the speed limit. When he reached the M-52 turnoff, he tapped his brakes, and Cobb's vehicle stayed close behind him. Both Swantek and his passenger, King, testified that Cobb was tailgating them.

Swantek testified that he pulled into the gas station to get gas. He stated that Cobb pulled in behind him, paused, and then pulled beside his vehicle. He testified that Cobb threatened "I'll kill you" and then unleashed a "barrage of obscenities" before pulling through the gas station and then turning onto southbound M-52. Swantek's passenger, King, recounted that although he did not hear the exact words used, Cobb's tone was aggressive. He stated that under the circumstances he was nervous and a little scared. Swantek asserted that he did not get any gas because he "felt very unnerved being told: I'll kill you, and being tailgated." Swantek testified that he waited for about five minutes before leaving because he "wanted cooler heads to prevail" and "just wanted him gone." Swantek figured that, given the amount of time he gave Cobb to leave, he would be able to have "free access to the public road to go home," so he did not take an alternate route when leaving the gas station.

King testified that as they continued down M-52, he spotted Cobb's vehicle. When they passed Cobb's vehicle, it pulled behind them and started to tailgate them again. King testified that he started getting nervous again because he did not know what was going on. Swantek testified that he kept going for a short distance and when Cobb started getting closer to his

vehicle, he thought that he had to get out of there. He pulled onto the shoulder, hoping that Cobb would go by, but Cobb instead pulled behind him.

Swantek testified that because of the way Cobb had threatened him earlier, he was concerned that Cobb might have a gun. Specifically, he recounted that Cobb kept his hands down and was very calm and pugnacious when he threatened to kill Swantek. He testified that Cobb's vehicle continued to advance slowly after they both pulled onto the shoulder. When Cobb's vehicle was about one car-length behind him, he decided that he better do something. Swantek explained that when Cobb's vehicle stopped advancing, he drew his firearm from the center counsel and put it on his lap. He then pulled a U-turn. According to Swantek and King, while they were making the U-turn, Cobb drove toward them. Swantek thought that Cobb was going to T-bone them by ramming into the driver's side of the vehicle. King thought that they almost got hit. Swantek testified that when he saw Cobb "coming from the side of my vehicle I lifted up my firearm, cocked the hammer back and aimed for the left rear tire to disable the vehicle." He stated that he "did not shoot with the intent of hurting" Cobb, but he "wanted to disable the vehicle because [he] believed he was going to ram me."

Swantek testified that he fired three shots, two intentionally and a third accidently. He stated that immediately after firing, Cobb's vehicle "fell in right behind me and started to chase me," so he fired two more shots hoping that it would get Cobb to stop. When it didn't work, he made a hard right turn, was able to gain some speed and distance, and get away from what he characterized as a "life-threatening situation." On questioning from the court, Swantek testified that "the driver's compartment was well past where I was aiming" and that everything happened so fast that he did not remember if Cobb's vehicle was "pointing in the opposite direction" when he fired his gun at Cobb's vehicle.

Although Swantek requested a jury instruction on self-defense, the trial court denied it after concluding that Swantek could not have an honest and reasonable belief that he was in danger of great bodily harm. The court reasoned that Swantek drew his firearm without seeing Cobb produce any weapon and without Cobb getting out of his vehicle. Further, despite the alleged threat to kill Swantek at the gas station, Cobb's reason for later pursuing Swantek was to get his license plate number to immediately report it to the police. The court also pointed out that notwithstanding Swantek's testimony that he believed Cobb would T-bone his vehicle when he executed a U-turn, the ballistics evidence indicated that Swantek had completed the turn and was heading in the opposite direction than Cobb was traveling before he opened fire and struck the rear of Cobb's vehicle. Accordingly, the trial court found that the evidence did not support a self-defense instruction because there was no evidence that Swantek was in imminent danger when he fired his weapon.

During deliberations, the jury sent a note asking whether self-defense could be used to acquit if all elements of an offense were met. The trial court instructed them that it could not. Thereafter, the jury returned a verdict acquitting Swantek of assault with intent to murder and assault with intent to do great bodily harm less than murder, but convicting him of felonious assault and felony-firearm.

-3-

## II. JURY INSTRUCTIONS

### A. STANDARD OF REVIEW

Swantek argues that the trial court abused its discretion by denying his request for a self-defense instruction. We "review a claim of instructional error involving a question of law de novo, but we review the trial court's determination that a jury instruction applies to the facts of the case for an abuse of discretion." *People v Dupree*, 486 Mich 693, 702; 788 NW2d 399 (2010). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008). "[I]f an applicable instruction was not given, the defendant bears the burden of establishing that the trial court's failure to give the requested instruction resulted in a miscarriage of justice." *People v Riddle*, 467 Mich 116, 124; 649 NW2d 30 (2002). Reversal for failure to provide a jury instruction is unwarranted unless it appears that it is more probable than not that the error was outcome determinative. *Id*. at 124-125.

### B. ANALYSIS

A trial court is required to clearly present the case to the jury and instruct on the applicable law. *People v Katt*, 248 Mich App 282, 310; 639 NW2d 815 (2001). Accordingly, "jury instructions must include all the elements of the charged offenses" and any material issues, defenses, and theories supported by the evidence. *People v Canales*, 243 Mich App 571, 574; 624 NW2d 439 (2000). A defendant's request for a jury instruction on a theory or defense must be granted if supported by the evidence. *Riddle*, 467 Mich at 124.

"A claim of self-defense at common law required an honest and reasonable belief of an imminent danger of death or great bodily harm." *People v Orlewicz*, 293 Mich App 96, 102; 809 NW2d 194 (2011). Further, under the self-defense act, MCL 780.971 *et seq*., a defendant may use deadly force against another individual if (1) the defendant "is not engaged in the commission of a crime at the time he or she uses deadly force" and (2) the defendant "honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual." MCL 780.972(1)(a). There is no duty to retreat so long as the defendant is in a place where he or she "has the legal right to be." MCL 780.972(1)(a).

In this case, the trial court found that Swantek had failed to produce evidence showing that he honestly and reasonably believed that the use of deadly force was necessary to prevent imminent death or imminent great bodily harm from being inflicted on himself or his passenger. In order to do so, however, the trial court discounted Swantek's testimony that when he fired the shots, he believed he was going to be rammed by Cobb's vehicle. Relying on ballistics evidence, the trial court found that at the time Swantek fired, he had already completed his U-turn and was driving away from Cobb's vehicle in the opposite direction; therefore, because the vehicles were essentially parallel and moving away from each other, Swantek was not actually in danger of being rammed when he employed deadly force against Cobb. The trial court also appears to have credited Cobb's innocent explanation for his behavior, rather than crediting Swantek's reaction to that behavior. This was error.

" 'A defendant asserting an affirmative defense must produce *some evidence on all elements of the defens*e before the trial court is required to instruct the jury regarding the affirmative defense.' " *People v Guajardo*, 300 Mich App 26, 34-35; 832 NW2d 409 (2013) (citation omitted) (emphasis added). A requirement to produce some evidence does not mean that the defendant has to present better, more persuasive evidence than the prosecution's evidence, nor does it mean that the defendant must produce undisputed evidence. It only requires that there is *some* evidence on all elements of the defense. Here, Swantek and King testified to what happened when they were traveling home on April 17, 2015. In evaluating whether that evidence was sufficient to constitute "some" evidence that Swantek honestly and reasonably believed himself to be in imminent danger, the trial court should have viewed the situation as it appeared to Swantek because "the reasonableness of a defendant's actions depends on what an ordinarily prudent and intelligent person would do on the basis of the perceptions of the actor." *Orlewicz*, 293 Mich App at 102.

The record reflects that the facts, as they appeared to Swantek, were as follows. Late at night a vehicle started tailgating him and blinding him with its headlights. It followed him down one road, closely followed him onto a second road, and then pursued him into a gas station parking lot. At the gas station, the driver of the other vehicle threatened to kill him while his hands were out of sight and then drove away. Shaken, he waited five minutes and then pulled back onto the road to continue home. The other driver, however, was waiting for him when he drove by and again started following him. Again, the other vehicle was tailgating him and blinding him with its headlights. Based on this evidence, the jury could have concluded that a reasonable person would be alarmed at this point. The other driver—according to Swantek's version of events—had followed him, threatened him, waited for him, and then followed him again. Swantek then pulled off the road, hoping the other vehicle would go past him. It did not. Instead, it pulled off the road behind him, still blinding him and then started creeping closer to him. Because of the headlights blinding him, Swantek could not see what the other driver was doing. Swantek decided to leave by pulling a U-turn and heading in the opposite direction. While he was executing that turn, the other vehicle came toward him. Swantek testified that he believed it was going to ram him, and his passenger recounted that the other vehicle nearly struck them. At that point, a jury could find that Swantek was understandably concerned and scared to the point where he honestly and reasonably believed that he had to employ deadly force to shoot out the other vehicle's tire so it could not continue to follow him.

The trial court's focus on the ballistics evidence contradicting Swantek's testimony that he fired when he thought he was going to be rammed by the other vehicle essentially discounts the chain of events leading up to the moment Swantek fired his gun. Applying the trial court's reasoning, the exact second that the danger of being rammed by the other vehicle passed, Swantek should have immediately realized that any imminent threat of death or great bodily injury had ceased being a possibility. However, a defendant need not prove that he was in actual danger of an imminent threat of death or great bodily harm the exact second that he uses deadly force because the self-defense act only requires that the defendant honestly and reasonably

believe that he is in such danger.[1]  Here, based on Swantek's testimony and that of his passenger, a jury could find that—even if the exact second of danger had passed when Swantek fired his weapon—he still honestly and reasonably believe that he was in imminent danger of death or great bodily harm.  Consequently, the trial court abused its discretion by denying Swantek's request for a jury instruction on self-defense.

Moreover, given that the jury acquitted Swantek of the more severe offense on the jury verdict form—assault with intent to murder and assault with intent to do great bodily harm less than murder—and given that the jury expressly asked whether it could apply self-defense, we believe that the trial court's instructional error was outcome determinative and reversal is required.  See *Riddle*, 467 Mich at 124-125.[2]

Reversed and remanded for a new trial.  We do not retain jurisdiction.

/s/ Michael J. Kelly
/s/ Amy Ronayne Krause
/s/ Mark T. Boonstra

---

[1] For example, suppose a gunman fires a shot at a defendant and then runs out of bullets. Suppose further that, still believing the gunman has bullets and will shoot him again, the defendant draws his own firearm and shoots and kills the gunman.  Even though the actual threat of being shot and killed by the gunman had stopped being imminent, based on the defendant's perception, an ordinarily prudent and intelligent person would likely conclude that he or she was still in imminent danger of death or great bodily harm.  See *Orlewicz*, 293 Mich App at 102.

[2] Swantek also asserts that the trial court abused its discretion (1) by denying him the ability to call an expert witness and (2) by limiting his cross-examination of Cobb with regard to whether Cobb was a former firefighter.  Given our resolution of the jury-instructions issue, we decline to address those issues further.  Nothing in our opinion, however, should be construed to preclude Swantek from raising those issues with the trial court in connection with his new trial.